**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | Docket No: 16-cr-10268-IT |
| SCHULTZ CHAN a.k.a. JASON CHAN SONGJIANG WANG, | ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**DEFENDANTS' JOINT MOTION TO DISMISS COUNTS 3 AND 4 AND SO MUCH OF COUNT 1 THAT ALLEGES A CONSPIRACY TO COMMIT SECURITIES FRAUD REGARDING AKEBIA STOCK AND INCORPORATED MEMORANDUM OF LAW**

NOW COME the defendants Schultz Chan, ("Chan"), and Songjiang Wang, ("Wang"), and hereby move this Honorable Court pursuant to Fed.R.Crim.P., Rule 12 to dismiss so much of Count 1 that alleges a conspiracy to commit securities fraud regarding Akebia stock purchases and to dismiss Counts 3 and 4 in their entirety. In support thereof, counsel state the following:

**I.   INTRODUCTION**

The Defendants are charged in Count 1 of a Superseding Indictment with conspiracy to commit securities fraud in violation of 18 U.S.C. 371 regarding their purchases of stock in Merrimack Pharmaceuticals, Inc.,[1] ("Merrimack") and Akebia Therapeutics, Inc.,[2] ("Akebia"), which are Massachusetts based publicly held corporations.  Count 2 charges both Defendants with securities fraud regarding Chan's purchase of Merrimack securities at a time when Wang is

---

[1] It is undisputed that at all times relevant to the Superseding Indictment that Wang was employed by Merrimack as the Director of Statistical Programing.

[2] Chan's employment with Akebia as the Director of Biostatistics began on August 17, 2015.

alleged to have been in possession of material nonpublic information, ("MNPI"). Count 3 charges both Defendants with securities fraud regarding Wang's purchase of Akebia securities at a time when Chan is alleged to have been in possession of MNPI.

Lastly, Count 4 charges Chan individually with securities fraud in connection with his purchase of Akebia securities at a time when he was in possession of MNPI.

## A. AKEBIA PRODUCT AKB-6548 AND PHASED DRUG STUDIES

- AKB-6548 has been given the commercial name "Vadadustat" and is the developmental medication at the heart of the Akebia case. Vadadustat was and is the primary focus of Akebia's research and development since 2007. (See Exhibit 1, filed herewith). Vadadustat was developed to treat anemia in patients with Chronic Kidney Disease, ("CKD"), by stimulating the patient's production of hemoglobin. *Id.*

- Phase 2b refers to the completed portion of the Vadadustat study which was published in the Quarterly Report on August 11, 2015, which targeted individuals with anemia secondary to CKD.

- Phase 2 refers to the portion of the Vadadustat study which targeted individuals with anemia CKD who were on dialysis. This was the study that was completed in August of 2015 and announced on September 8, 2015. *Id.* **It is highly significant distinction that the Phase 2 study was not determinative of the effectiveness of Vadadustat which had already been established. It was determinative of whether the dialysis process cleaned the benefits of Vadadustat from the patient's blood.** As a result, Vadadustat could have been used to effectively treat patients on dialysis even if the dialysis cleaned the benefits out of their blood on a periodic basis.

- Phase 3 refers to the developmental stage of Vadadustat for international distribution.

**B. THE AKEBIA TIMELINE  (SEE EXHIBIT 1, SEC QUARTERLY REPORT 8/11/15, FILED HEREWITH)**

| | |
|---|---|
| 3/25/07 | Akebia initial IPO.  *Id.* |
| 6/20/14 | Akebia shares trading on NASDAQ at $31.00.  (See Exhibit 2, filed herewith) |
| 3/7/15 | Akebia shares trading on NASDAQ at $7.27.  *Id.* |
| 7/28/15 | Chan accepts job offer from Akebia. |
| 8/11/15 | Akebia files its Quarterly Report with the SEC and touts the success of Phase 2b along with its expectation that Phase 2 results will be announced in the 3rd Qtr. of 2015. The Report also emphasized that Phase 3 production was already in the works.  (Exhibit 1). |
| 8/13/15 | Chan purchases 2,200 shares of Akebia on Etrade |
| 8/14/15 | Akebia announces blackout period and quiet period in an email from the GC to all employees.  There is no evidence that Chan received this email although the SEC Civil Complaint alleges that these emails would have been waiting for Chan when he arrived for his first day of work on August 17, 2015.  *SEC v. Chan*, 16-cv-11106-ADB, p. 5. |
| 8/17/15 | Chan starts work at Akebia. |
| 8/17/15 | Study database locked. |
| 8/18/15 | 3rd Party Innovative Analytics analyzed Phase 2 study data. |
| 8/19/15 | 9:47 PM Chan orders the purchase of 7,900 Akebia shares which executes on 8/20/15. |
| 8/21/15 | 6:41 AM  Chan buys 5,900 Akebia shares. |
| 8/21/15 | 3:10 PM Chan obtains access to database.  (See Exhibit 3, filed herewith) |
| 8/28-9/4/15 | Wang buys 27,990 Akebia shares. |
| 9/8/15 | Akebia announces top-line results for Phase 2. |

Additionally, several publications did pick up on the SEC Quarterly filing and published the information between August 11, 2015 and September 8, 2015.  Although Akebia did not issue an announcement until September 8, 2015, they were able to provide the Government with a list of publications.  (See Exhibit 4, filed herewith).

3

### C. PHASE 2 DIALYSIS PATIENTS REPRESENT 1% OF THE GLOBAL MARKET SHARE OF CKD PATIENTS.

Recent data demonstrates that 14% of the U.S. population has CKD which equates to approximately 42,000,000 million patients.  (See Exhibit 5 filed herewith, *National Institute of Diabetes & Digestive & Kidney Diseases, niddk.nih.gov (2015)*).  Diabetes is an advanced form of CKD for which dialysis is used to treat the most severe form of diabetes.  Dialysis is used to treat 468,000 patients annually in the United States.[3]   As a result, only 1.114% of the potential CKD patients are on dialysis.  Phase 2 relates only to this small percentage.

This percentage is also reflected in the distribution and licensing deals Akebia has signed for Vadadustat and recent news regarding Akebia's marketing of Vadadustat bears this out.  Akebia signed an exclusive license agreement for $50,000,000 with Vifor Pharma Group to distribute Vadadustat to 185,000 U.S. dialysis patients, or 40% of all U.S. dialysis patients.[4]   Akebia has also entered into a U.S. distribution agreement with Otsuka Pharmaceutical Company for $1,000,000 plus 30% royalties earned in Otsuka's other distribution chains in Europe, Russia and China said to be worth another $1.5 billion.[5]   Akebia also entered into an agreement with Mitsubishi Tanabe on a $390 million deal to develop and commercialize Vadadustat in Japan, Taiwan, South Korea, Indonesia, India, and other Asian countries.  *Id.*

Lastly, Phase 2 was not a study to determine the efficacy or danger or Vadadustat.  It was simply method of determining whether the potential benefits observed in Phase 2b and earlier

---

[3] https://www.kidney.org/news/newsroom/factsheets/End-Stage-Renal-Disease-in-the-US.
[4] https://globenewswire.com/news-release/2017/05/16/985232/0/en/Vifor-Pharma-and-Akebia-Announce-Exclusive-License-Agreement-to-Provide-Vadadustat-to-Fresenius-Medical-Care-in-the-U-S-Upon-FDA-Approval.html.
[5] http://www.genengnews.com/gen-news-highlights/otsuka-akebia-expand-vadadustat-development-deal-to-europe-and-beyond/81254253.

studies could be sustained by dialysis patients after receiving dialysis treatment. This information was publicly available information prior to Chan's employment at Akebia. Phase 2 determined that the benefits of Vadadustat would remain with dialysis patients after their dialysis treatments. If Phase 2 had failed, Vadadustat was still beneficial to dialysis patients who continued to take the drag after dialysis. Therefore, the 1.1% of CKD patients who are on dialysis in the United States may still have taken Vadadustat for the periodic benefits preceding dialysis. These statistics render the Phase 2 study immaterial to the long term profitablilty of Vadadustat and the value of Akebia's stock.

Based upon the foregoing, it is highly unlikely that the September 8, 2015 announcement is what drove the market up by 50%. Rather, the huge market share presented by the successful testing of Vadadustat in Phase 2b on CKD patients in general led the Akebia post September 8, 2015 rally.

## II.   ARGUMENT

### A.   PURE LEGAL IMPOSSIBILITY IS ALWAYS A DEFENSE

First Circuit law is well-settled that pure legal impossibility is always a defense. *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013). In *Fernandez*, the defendants were charged with conspiring to bribe a legislator by paying various costs associated with the legislator travelling to Las Vegas for a boxing match at a time when the legislator was scheduled to vote on a bill under which defendants would gain financially. However, the court found that pure legal impossibility existed because the trip was planned for a time-period occurring two weeks after the applicable bribery statute was repealed. Thus, the conspirators were plotting to do something that was not illegal. In reversing the defendant's conspiracy conviction the court stated that "[P]ure legal impossibility is always a defense. For example, a hunter cannot be convicted of attempting to

5

shoot a deer if the law does not prohibit shooting deer in the first place." *Citing United States v. Hsu*, 155 F.3d 189 (3rd Cir. 1998). Although Hsu's hypothetical discussed pure legal impossibility in the context of attempts, "[o]bviously a charge of conspiracy to shoot a deer would be equally untenable. *Citing In re Sealed Case,* 223 F.3d at 779." The notion of "pure legal impossibility" arose out of an effort to distinguish between factual impossibility and legal impossibility. It is well-settled law that factual impossibility is not a defense to conspiracy. Thus, where the law prohibits secretly bringing artwork into the country with a value of $5,000 or more, and defendants plotted to import stolen artwork only to find that the artwork was a forgery and worth far less than $5000, their mistake of fact was not a defense. *United States v. Waldron,* 590 F.2d 33 (1st Cir. 1979) citing *Craven v. United States*, 22 F.2d 605 (holding that "a conspiracy to smuggle foreign liquor would be made out, even if . . . in effecting the conspiracy . . . the conspirators had been imposed upon by the substitution of liquor of domestic origin.") See also *United States v. Rodriguez*, 215 F.3d 110 (1st Cir.) *Citing United States v. Giry*, 818 F.2d 120, 126 (1st Cir. 1987). ("The crime is the illegal agreement; if there was such an agreement, it does not matter that the purpose of the agreement was not achieved, or even that achieving that purpose was factually impossible."). Similarly, mixed factual and legal impossibility is not a defense. Findings of mixed factual and legal impossibility have included cases where attempting to meet with a minor for purposes of engaging in criminal activity, when in fact an adult law enforcement agent was posing as a minor. *United States v. Farner*, 251 F.3d 510 (5th Cir. 2001); *United States v. Tykarsky*, 446 F.3d 458 (3rd Cir. 2006). Likewise, misrepresenting one's ability to work, when defendant would have been eligible for insurance benefits regardless of whether defendant was totally disabled. *United States v. Dotson*, 407 F.3d 387 (5th Cir. 2005). Conspiring to illegally obtain a trade secret, where in discovery the government refused to produce the alleged trade secret and it was held whether the information was actually a trade

secret was irrelevant.  *United States v. Hsu*, supra.  However, pure legal impossibility exists "when actions which the defendant performs or sets in motion, even if fully carried out as he desires, would not constitute a crime." *United States v. Dotson*, supra citing *United States v. Farner, supra.*  Put another way, "[p]ure legal impossibility occurs where the law does not proscribe the goal the defendant desired to achieve." *United States v. Tykarsky, supra,* citing *United States v. Hsu*, *supra.*   Other districts have also recognized that pure impossibility is always a defense.  These cases have included a conspiracy to commit election fraud where the transaction at issue was not prohibited by the Federal Election Campaign Act,  *In Re Sealed Case,* 223 F.3d 775 (D.C. Cir. 2000), and a conspiracy to smuggle negotiable instruments where the defendants erroneously believed the instruments were subject to reporting requirements.  *United States v. Ali*, 561 F.Supp.2d 265 (E.D.N.Y. 2008).

    **B.**    **COUNT 4 MUST BE DISMISSED WHERE IT WAS LEGALLY IMPOSSIBLE FOR CHAN TO HAVE USED MNPI BEFORE HE ACTUALLY RECEIVED MNPI.**

Count 4 alleges that Chan used MNPI to purchase Akebia securities in August of 2015.  It is undisputed that Chan did not start working at Akebia until August 17, 2015 and did not receive access to MNPI until 3:10 P.M. on August 21, 2015[6].  Because all of Chan's Akebia purchases occurred before 3:10 P.M. on August 21, 2015, it is legally impossible for Chan to engaged in securities fraud.   Moreover, there is no evidence that Chan received any information about the blackout period or quiet period or even knew the difference between Phase 2 and 2b four days into his employment with Akebia.

---

[6] This time is established by an email sent to Chan giving him access to a database.  However, it remains unclear when Chan may have accessed that database.

As a result, this case is very similar to the facts in *United States v. Fernandez* where the court ruled that the defendants could not have legally committed the crime where the federal bribery statute had been repealed two weeks before the commission of their alleged bribery. 722 F.3d 1. Accordingly, Count 4 must be dismissed.

### C.  THE MNPI THAT CHAN ALLEGEDLY POSSESSED WAS IMMATERIAL TO THE TRADES THEMSELVES AND STOCK VALUATION ON SEPTEMBER 9, 2015.

As set forth above, the August 11, 2015 SEC Quarterly filing announced to the world that Vadadustat was going to be wildly successful and profitable for patients with CKD. The fact that dialysis patients would not have the benefits removed from their blood on a periodic basis was important to them, but had no bearing on the market value of Vadadustat or Akebia's stock. The entire stock rally after the September 8, 2015 announcement was a result of the market share represented by the 42,000,000 CKD patients represented by Phase 2b. To suggest that it was driven by Phase 2 which was already captured in Phase 2b is pure fiction and should not be the basis for criminal charges.

Nonpublic information is material where there is a " 'substantial likelihood' that a 'reasonable investor' would have considered the … information significant at the time." *Basic v. Levinson,* 485 U.S. 224, 231–32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)). In S.E.C. v. Mayhew, 916 F.Supp.. 123, 131 (D.CT 1995), the court reasoned that the timing of the defendant's insider transactions and importance that he placed on it in increasing his position mitigated in favor of the importance of the information and therefore found it to be material. Here, Chan was purchasing Akebia stock before he received the alleged MNPI and he did not make any purchases after receiving the information. As a result, the evidence compels a finding that there was no crime committed.

**D.      COUNTS 1 AND 3 SHOULD BE DISMISSED AS THERE IS NO EVIDENCE TO SUPPORT THE ALLEGATION THAT CHAN MISAPPROPRIATED MNPI.**

Absent the false information set forth in the SEC Complaint and various affidavits, there is not a single word describing the material non-public information, nor is there an indication of when he received the information – whether before or after he made trades in Akebia – or how it influenced his trading in Akebia securities, and thus no evidence that he violated his fiduciary duty. See *SEC v. McGinnis*, 2015 U.S. Dist. Lexist 127406, Fed. Sec. L. Rep. (CCH) P98,822.

Actually, Chan did not receive access to the 2015 Phase 2 study results until 3:10 PM on August 21, 2015, while his last trade was already placed at 6:27 AM, before he had possession of allegedly material non-public information. His two trades of Akebia stock during the so-called blackout period were limit orders, which under Rule 10b5-1 do not meet the scienter requirement for violating his fiduciary duty: he entered into the agreements before he knew any MNPI; he was entering into a specific contractual agreement that he did not influence; the purchase or sale of Akebia proceeded according to the limit order – regardless of what information he did or did not receive. See Rule 10b5-1(c)(1)(i)(A)-(C). There is no evidence that there are any "attendant circumstances" to demonstrate how Chan obtained or utilized the information. *McGinnis*, 2015 U.S. Dist. Lexist 127406 at 48-49. Although in an insider trading case, the Court may infer scienter from the circumstantial evidence. *Herman & MacLean v. Huddleston*, 459 U.S. 375 at 391 n.30 (1983); *Michaels v. Michaels*, 767 F.2d 1185, 1199 (7th Cir. 1985). There is none here. *See, e.g. SEC v. Adler*, 137 F.3d 1325, 1340-41 (11th Cir. 1998) ("Insider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter.")

Count 3 provides similarly little information, except that Count 3 alleges – again, with no specifics or detail – that the MNPI provided by Chan to Wang was exchanged for information about the company for which the friend worked (Merrimack.)

In *United States v. Larrabee*, the court enunciated factors to consider in such "misappropriation" cases involving tipping and mostly or all circumstantial evidence. 240 F.3d 18 (2001). These factors include: "(1) access to information; (2) relationship between the tipper and tippee; (3) timing of the contact between the tipper and tippee; (4) timing of the trades; (5) pattern of trades; and (6) attempts to conceal either the trades or the relationship between tipper and tippee." *Larrabee,* 240 F.3d at 21-22; see also *McGinnis*, 2015 U.S. Dist. LEXIS 127406 at 10-14.

The Court in *Larrabee*, as well is a number of SEC cases analyzing motions for summary judgement, looked at those factors in a very fact-dependant way, determining whether there was sufficient evidence that the defendant disclosed material non-public information. Larrabee, 240 F.3d at 22-24; see also, *e.g., McGinnis*, 2015 U.S. Dist. LEXIS 127406 at 10-14.

In Larrabee, the tipper had a documented and recorded opportunity to obtain the information while at work; he had a complex personal, financial and professional relationship with the tippee including spending vacations together, the tippee paying tuition for the tippee, and the regular exchange of large sums of money; the timing of the contact and trades immediately followed the tipper's opporunity to get the MNPI and the trades themselves followed an unusual pattern; and the tipper attempted to obfuscate his relationship with the tippee and the trades that they had made. 240 F.3d at 22-24. Similarly, in *McGinnis*, all of the factors were satisfied – in detail, with a complex analysis of alignment of trades made by the breacher of the fiduciary duty and multiple tippees. 2015 U.S. Dist. LEXIS 127406 at 10-14.

However, in this case, many of those factors are not present. Although Chan had material non-public information prior to the trades of the tippees, and although Chan had a relationship with the tippees, the contact between Chan and the tippees was not immediately following the discovery of that information, as it was in *Larrabee*. 240 F.3d at 22-24. The trades also did not immediately follow the contact, nor did the trades align in timing, nor were profits realized. Id; see also *McGinnis*, 2015 U.S. Dist. LEXIS 127406 at 10-14.

Likewise, Chan's only provable contact with Wang did not immediately follow discovery of the alleged MNPI and there was not a change in any way from prior history. Further, the way the trades were executed was not unusual or hidden – in *Larrabee,* the tippee was a broker who made a trade twice as large as any he had executed, across more accounts than usual, and who remained on the phone to make sure the trade went through before the market closed. 240 F.3d at 22-24.

Finally, neither Chan nor Wang made any effort to conceal their trades or their relationship, in stark contrast to the individuals in *Larrabee. Id.* There is thus no suspicious timing between phone conversations among Chan and Wang. contra, e.g., *SEC v. Alexander*, 160 F. Supp. 2d 642 at 652-53 (SDNY 2001) (holding that the "timing of the alleged contacts" combined with the "subsequent purchases" of securities, create a "strong inference" of insider trading); *SEC v. Warde*, 151 F.3d 42, 47- 48 (2d Cir. 1998) (defendant's access to insider information, coupled with pattern of phone calls and stock purchases, provided sufficient evidence of insider trading to support jury verdict); *SEC v. Scoppetoulo*, 2011 U.S. Dist. LEXIS 7819 at *3* ("The SEC also sets forth specific factual allegations that reveal a pattern of phone calls, text messages, meetings, stock purchases and subsequent trading resulting in profit * * *").

## **CONCLUSION**

For all of the reasons stated above, the Defendants respectfully request that this Honorable Court find that because the law did not prohibit Chan from purchasing Akebia stock prior to August 21, 2015 at 3:10 PM, all purchases made by Chan prior to that time were lawful. Similarly, because Chan's purchases were lawfully proscribed, Wang's purchases were lawful as well. At a minimum the Akebia purchases can never satisfy the definition of materiality bases upon the August 11, 2015 SEC filing. As a result, the legal doctrine of pure legal impossibility dictates that Count 4 should be dismissed and so much of Count's 1 and 3 that allege a conspiracy to purchase Akebia stock.

Dated:  October 23, 2017                    Respectfully submitted,

_____
Peter Charles Horstmann, Esquire
BBO #556377
450 Lexington Street, Suite 101
Newton, Massachusetts 02461
(617) 723-1980


-s-

_____
Elliot M. Weinstein, Esquire
3 Atlantic Ave
Boston, MA 02110
(617) 367-9334

## LOCAL RULE 7.1 CERTIFICATION

Defendants have conferred with the United States in an unsuccessful attempt to narrow or resolve these issues.

_____
Peter Charles Horstmann, Esquire

## CERTIFICATE OF SERVICE

I, Peter Charles Horstmann, Esquire, hereby certify that on this 23rd day of October, 2017, a copy of the foregoing motion was served electronically, upon Stephen Frank, Office of the United States Attorney, One Courthouse Way, Boston, MA 02110.

_____
Peter Charles Horstmann, Esquire